IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TAMARA MERCHANT, | ) | CASE NO. 4:16CV1082 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Tamara Merchant ("Merchant") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 12.

For the reasons stated below, the decision of the Commissioner is **AFFIRMED**.

## I. Procedural History

Merchant filed applications for DIB and SSI on August 6, 2012, alleging a disability onset date of February 1, 2012.  Tr. 21, 222, 228.  She alleged disability based on degenerative osteoarthritis.  Tr. 263.  After denials by the state agency initially (Tr. 108, 109) and on reconsideration (Tr. 134, 135), Merchant requested an administrative hearing.  Tr. 152.  A hearing was held before Administrative Law Judge ("ALJ") Jeffrey Raeber on October 24, 2014.[1]  Tr. 54-85.  In his November 20, 2014, decision (Tr. 21-33), the ALJ determined that

---

[1]  A hearing was initially held on August 27, 2014, but Merchant did not appear due to car trouble.  Tr. 21, 41-52.  Although her counsel appeared on August 27 and the ALJ asked Vocational Expert Ja'Nitta Marbury questions , the

1

there were jobs in the national economy that Merchant could perform, i.e., she was not disabled. Tr. 32. Merchant requested review of the ALJ's decision by the Appeals Council (Tr. 40) and, on March 23, 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Merchant was born in 1965 and was 46 years old on the date her applications were filed. Tr. 259. She completed tenth or eleventh grade. Tr. 63, 264. She last worked in 2011 as a scrapper picking up cans. Tr. 59-60. She previously performed work at a factory, did telemarketing, and rang a bell for the Salvation Army. Tr. 57-58.

### B. Relevant Medical Evidence[2]

On July 28, 2012, Merchant went to the emergency room complaining of gradual onset of left lower extremity swelling and moderate, constant pain that began several days prior to her visit. Tr. 340. She was noted to be a cigarette smoker and used marijuana about three times a week. Tr. 340. She weighed 200 pounds and had a body mass index ("BMI") approaching 35. Tr. 342. Upon exam of her left knee and calf, she had a full range of motion with pain and crepitus in her knee joint during flexion. Tr. 341. She had mild tenderness, no swelling, and no sensory or pulse deficit. Tr. 341. She displayed a limp. Tr. 341. X-rays of her left knee revealed "several calcifications that can be seen along the peripheral margin of the medial

---

ALJ relied upon the testimony of Vocational Expert Kevin Yi, who testified at the second hearing held on October 24. Tr. 32, 55. Thus, the Court will recount only the evidence presented at the second hearing.

[2] In her brief, Merchant includes medical evidence dated after the hearing that she submitted to the Appeals Council. Doc. 14, pp. 6-7. However, she did not request a Sentence Six remand. Thus, the Court may not consider this evidence when reviewing the ALJ's decision. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) ("[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision" unless pursuant to a Sentence Six remand, citing *Cotton v. Sullivan*, 2 F.3d 692, 695-696 (6th Cir. 1993)).

femoral condyte [] in the topography for the attachment of the medial collateral ligament" and "some calcifications of the Achilles tendon in the anterior superior margin of the patella."  Tr. 341.  Her joint spaces were preserved, she had some degenerative changes in her patellofemoral joint and her proximal tibiofibular joint, and minimal fluid accumulation in the suprapatellar recess.  Tr. 341.  A venous duplex study found no evidence of deep vein thrombosis.  Tr. 342.  She was diagnosed with leg pain and degenerative arthritis of her knee and discharged home in good condition.  Tr. 343.

On September 5, 2012, Merchant saw Debra Hilty, CNP, at Humility of Mary Health Partners ("HMHP") upon a referral from the emergency room.  Tr. 336.  She described pain in her left knee and left ankle that began two years prior, the pain was constant, aching and shooting, and it was a 9/10 in severity.  Tr. 336.  She also complained of an "inability to bear weight (some days 'unable to walk on it')" and numbness in her left knee; her symptoms were aggravated by weight bearing and movement; and NSAIDs, rest, and non-weight bearing activities provided mild relief.  Tr. 336.  Upon exam, she had mild edema and tenderness over her entire left knee, albeit "less pain expressed with distraction"; crepitus; a normal range of motion; no ligament laxity; and she was not in distress.  Tr. 336.  Hilty referred her to physical therapy and prescribed a low dose of Mobic.  Tr. 337.

Merchant returned to Nurse Hilty on October 11, 2012.  Tr. 337.  She reported that she was unable to attend physical therapy and was only able to get half her Mobic prescription due to cost.  Tr. 337.  On examination, she had a normal range of motion, slight edema, no tenderness, and slight weakness with dorsiflexion of her left foot.  Tr. 338.  She was prescribed Naprosyn and physical therapy.  Tr. 338.  She was advised that her medications were available at a local supermarket for $4 and counseled to stop smoking cigarettes.  Tr. 338-339.

On November 7, 2012, Merchant presented to physical therapy for an initial assessment. Tr. 349. She reported pain in her left knee for about a year and that medications helped. Tr. 349. Her left knee pain was 8/10. Tr. 349. Upon exam, she had a full range of motion in all four extremities, normal sensory responses, and only diminished left leg strength, 4/5, at her left hip/knee. Tr. 350. She had a normal gait and ambulated independently. Tr. 350. Her prognosis was fair and she tolerated treatment well. Tr. 351. She attended two more sessions and reported that she was performing her home exercises as recommended but still had 8/10 pain. Tr. 353-354. She cancelled her fourth and last session on November 20 because her "legs are hurting too bad today." Tr. 356. She did not show up for a rescheduled visit. Tr. 358.

On December 10, 2012, Merchant returned to HMHP. Tr. 367. She stated that her left knee was injured 20 years previously and that it had slowly worsened over the six months to one year. Tr. 367. She was still very symptomatic with activities of daily living and simple steps while taking Naprosyn and she reported that physical therapy had aggravated her symptoms. Tr. 367. At the time of her visit she could not ascend stairs at all due to her pain. Tr. 367. She refused knee injections because she had had her knee drained in the past and it had been very uncomfortable. Tr. 367-368. The attending physician reviewed her x-rays, recommended that she consult orthopedics, and opined that her condition was not severe and that she would not likely be a knee replacement candidate. Tr. 367. Upon exam, Merchant's left knee appeared larger than her right, but she had no edema, her muscle strength was intact, anterior and posterior drawer tests were negative, her peripheral pulses were palpable, and she had no sensory deficits.[3] Tr. 368. She weighed 254 pounds and her BMI was 43.60. Tr. 368. She was referred for an orthopedic consultation and ordered to follow up in three months. Tr. 368.

---

[3] A drawer test measures the integrity of the cruciate ligaments of the knee; a positive sign is when, upon flexion, the tibia can be drawn too far forward or backward. *See Dorland's Illustrated Medical Dictionary*, 32nd Edition, 2012, at 1889.

4

On March 5, 2013, an x-ray taken of Merchant's left knee showed significant marginal osteophytosis at the medial compartment and moderate medial joint space narrowing.  Tr. 374.  She had sclerosis along the lateral margin of her proximal tibia that was stable since her last x-ray and calcification, expectedly, in the lateral collateral ligament.  Tr. 374.  Thereafter, Merchant had her left knee injected.  Tr. 370.

On April 1, 2013, Merchant visited HMHP and stated that the injection made her left knee "better," but that she was having pain and swelling in her right knee.  Tr. 360.  She had had two out of her three left knee injections but did not go to her third and last appointment because of her right knee pain.  Tr. 370.  She stated that, as a result of her right knee swelling, "she has not been able to work well."  Tr. 370.  She reported that she cut down on smoking from 1 pack per day to 1/2 a pack per day but she was not ready to quit.  Tr. 370.  Upon examination, her muscle strength was intact and she had no edema, warmth or redness in her right knee; she had palpable peripheral pulses; and she had lateral effusion and tenderness when a stress test for ligament damage was performed.  Tr. 371.  Her left knee was assessed as having improved some after two injections and a follow-up for her third injection was recommended.  Tr. 371.  X-rays of her right knee were ordered and she was referred to a doctor to perform right knee injections.  Tr. 371.

On April 17, 2013, Merchant had an x-ray of her right knee.  Tr. 373.  It showed mild osteoarthritic changes with decreased medial joint space, multiple small marginal osteophytes, and mild suprapatellar joint effusion.  Tr. 373.

Merchant returned to HMHP on July 11, 2013.  Tr. 375.  She reported intermittent back pain for the last month and bilateral knee pain that worsened with walking and going up stairs.  Tr. 375.  Upon exam, she had crepitus upon flexion and extension of both knees and small

5

medial effusion on her left knee.  Tr. 376.  She had no edema or sensory deficits and her peripheral pulses were palpable.  Tr. 376.  She was not a candidate for a knee replacement due to her age and BMI and she reported that her prior knee injections were very painful and only lasted two to three days.  Tr. 376.  She was prescribed Tramadol and advised to follow up in three months, at which time, if her pain was still uncontrolled, she would be referred to pain management.  Tr. 376.

Merchant returned to HMHP on January 31, 2014, reporting bilateral knee pain.  Tr. 381.  Upon examination, she had no arthritis, arthralgia, myalgia, weakness, or morning stiffness.  Tr. 381.  She was referred to pain management.  Tr. 381.

On July 15, 2014, Merchant went to the emergency room for right knee and lower extremity pain starting one day prior.  Tr. 399.  Her pain was persistent, moderate, and worsened by right leg movement, standing and walking.  Tr. 399.  X-rays showed mild to moderate osteoarthritic changes.  Tr. 399.  She was treated with Percocet and discharged home in "good" condition with instructions to rest and use ice.  Tr. 395-396.

On September 5, 2014, Merchant visited HMHP complaining of bilateral hand, arm and shoulder pain.  Tr. 401.  Upon exam, she had tenderness in her hand joints and limited abduction and overhead rotation of both her shoulders, the left worse than the right.  Tr. 402.  She had normal muscle strength.  Tr. 402.  She was diagnosed with shoulder pain and bilateral carpal tunnel syndrome.  Tr. 402.

  C. **Medical Opinion Evidence**

      1. **Consultative examiner**

On September 10, 2012, Merchant saw Mary-Helene Massullo, D.O., for a consultative examination.  Tr. 314-326.  She complained of joint problems (pain and stiffness) with her knees

and her left ankle and that she has problems with her arms, too, and "cannot pick her arms up to even do her hair." Tr. 314-315. She has had knee problems for three years and she reported that she fell on her left knee ten years prior, went to the emergency room, x-rays showed water on her knee, they drained it, and it hurt badly when they did so and, thereafter, she started "poppin pills to go to work." Tr. 314. She reported that subsequent x-rays taken in 2012 showed arthritis. Tr. 314.

Merchant reported that she could walk 1/4 miles and go up and down stairs with difficulty, having to drag herself using the railing and sometimes she had to crawl. Tr. 315. She got along with her daily activities "so so." Tr. 315. Upon exam, Dr. Massullo observed that she appeared grossly obese, had fair mobility and good dexterity, and was in no apparent acute distress. Tr. 316. Her gait was abnormal with a limp favoring her left lower extremity and it was slow and cautious. Tr. 317. She did not allege trouble maintaining balance and had no apparent need for an ambulatory aid, although she stated that her left ankle will get so bad that she will have to drag it and, on these occasions, "one may be beneficial." Tr. 317. Dr. Massullo opined that Merchant appeared "able to be in an upright position, on [her] feet for at least 2-3 hours out of an eight hour workday, either standing or walking." Tr. 317. She was able to grasp and manipulate with each hand with normal pinch and fine manipulation as in typing and appeared able to open a door, a jar, pick up keys, pick up a coin, write, button, unbutton, zip and unzip. Tr. 317. She appeared not to be a fall risk. Tr. 317. Her joints presented with no abnormal heat, redness, thickening or swelling, bony enlargement, effusion, synovial thickening, tenderness, pain with range of motion maneuvers, deformities, contractures, ligamentous laxity or crepitus, and she had no edema in her feet or ankles. Tr. 317, 318. She had a reduced range of motion in her bilateral shoulders, hips, and left knee. Tr. 318. She had no evidence of muscle spasm or

7

tenderness in any area of her back/spine and her motor system presented with good tone, strength, and coordination with an apparent normal ability to rise from a seated position without using hands, to mount the examination table, to dismount the examination table, and to heel and toe walk.  Tr. 318.  Her sensory system was intact to all modalities of testing.  Tr. 318.

X-rays of Merchant's left knee confirmed mild to moderate degenerative changes in the medial joint compartment with joint space narrowing, mild degenerative changes in the patellofemoral joint compartment, and a "[l]ikely old injury at the origin of the left MCL, with heterotopic ossification."  Tr. 319.  X-rays of her left ankle showed mild heterotopic ossifications over the medial aspect of the medial malleolus, suggesting a remote deltoid ligament injury, lucencies at the medial aspect of the talar dome suggesting a remote osteochondral injury, and plantar and posterior dorsal calcaneal enthesophytes.  Tr. 322.

Dr. Masullo diagnosed Merchant with gross obesity; chronic arthalgia of both knees, both shoulders, and her left ankle; diminished flexion of bilateral hips and left knee; and diminished range of motion in her bilateral shoulders in most planes.  Tr. 319.  She concluded that Merchant was capable of doing work related activities and that the following were compromised: prolonged walking, standing, traveling using her bilateral lower extremities, and bending or lifting using her bilateral lower or upper extremities.  Tr. 319.  She opined that Merchant appeared able to perform work in a seated position where she could get up and move about as needed and perform gross movements with her bilateral upper extremities.  Tr. 319.

### 2. State agency reviewers

On September 25, 2012, state agency physician Leigh Thomas, M.D., reviewed Merchant's records.  Tr.  90-94.  Regarding Merchant's residual functional capacity ("RFC"), Dr. Thomas opined that Merchant could occasionally lift and/or carry 20 pounds and frequently

lift and/or carry 10 pounds; stand and/or walk 2 hours in an 8-hour workday and sit about 6 hours in an 8-hour workday; push/pull an unlimited amount but was limited in her ability to reach in any direction; could never climb ladders, ropes, or scaffolds; could frequently balance and climb ramps and stairs; could occasionally stoop, kneel, crouch and crawl; and had additional environmental limitations.  Tr. 91-94.

On February 12, 2013, Gerald Klyop, M.D., reviewed Merchant's record and adopted Dr. Thomas's opinion.  Tr. 116-119.

### D. Testimonial Evidence

#### 1. Merchant's Testimony

Merchant was represented by counsel and testified at the administrative hearing.  Tr. 55-78.  She testified that she is single and lives with her adult son.  Tr. 61.  She also has two adult daughters.  Tr. 61.  Her brother drove her to the hearing; she no longer has a driver's license.  Tr. 61-62.

Merchant stated that, during the day, she lies on the couch and does not go anywhere because she hurts all the time.  Tr. 62.  She has been doing this for the past year.  Tr. 62.  She tries to do household chores, but if she tries to do the dishes her back hurts and if she sweeps her arms and hands hurt.  Tr. 62.  She has not done any chores for about two months.  Tr. 62.

Merchant stated that, at the time of the hearing, she weighed 277 pounds and was 5'4".  Tr. 63.  She last saw a doctor the week before the hearing because of her arm and shoulder problems.  Tr. 63.  Her arms and shoulders hurt all the time, for the last 12 years or more, and have gotten worse the past year.  Tr. 63, 64.  Her arms feel heavy and they tingle all the time as if the blood is not flowing like it should.  Tr. 63.  She cannot even lift because her hands have been going numb for the past six months.  Tr. 64.  They hurt when she writes or tries to do her hair or

"anything." Tr. 64, 71. She can lift maybe a gallon jug of milk with her right arm but cannot lift anything with her left arm. Tr. 68-71.

Her knees hurt and are swollen; her right leg swells and goes down but her left leg is swollen all the time. Tr. 65. She has had swelling in them for about two years. Tr. 65. She got injections in her knees but this made them hurt more. Tr. 66. She stays on the couch so that she can keep her legs elevated and puts ice or heat on her knees. Tr. 66, 67, 75-76. She has to get up and move after about 20-30 minutes because her left knee gets stiff. Tr. 76. Her ankle was injured years ago—about 1998—and when she places it on the ground to walk it feels like pins sticking in the heel of her foot. Tr. 67, 76. When this happens or when it gets swollen she will sit down or drag it to walk. Tr. 74, 76. The last time she had to drag it to walk was about two months prior to the hearing. Tr. 74. She is able to stand for about five minutes and then her back starts to hurt. Tr. 71-72. She gets tired when she walks, including the distance from the hearing room down the hallway. Tr. 72. She has no problems with sitting. Tr. 72. But sitting too long (about 15-20 minutes) makes the swelling and pain in her left knee worse. Tr. 75. She has to get up and move around because it feels like it is locking up on her. Tr. 75.

Merchant smokes about a half a pack of cigarettes a day and got an electronic cigarette to try to quit smoking. Tr. 72-73. She smokes marijuana about once a month, if she feels like it. Tr. 73. She used to be outgoing and went to parties and clubs, worked all her life, saw her mother and siblings and shopped at the mall, but she can no longer do these things. Tr. 77. For example, her mother is old and cannot go down stairs and Merchant cannot go up and down stairs so as to see her. Tr. 77. She can go up about six or seven stairs without being tired. Tr. 77. She does not sleep well and cold temperatures make her bones ache. Tr. 77-78. She does not have braces or any other medical device that she uses for her knees. Tr. 78.

10

### 2. Vocational Expert's Testimony

Vocational Expert Kevin Yi ("VE") testified at the administrative hearing. Tr. 78-84. The ALJ discussed with the VE Merchant's past relevant work as an assembler, paper deliverer, scrapper, hauler, telemarketer and food preparation worker. Tr. 79, 311. The ALJ asked the VE to determine whether a hypothetical individual of Merchant's age, education and work experience could perform her past work if the individual had the following characteristics: can stand and walk about two hours and sit for six hours in an eight-hour workday with normal breaks; can lift up to twenty pounds occasionally and lift and carry up to ten pounds frequently; can never climb ladders, ropes or scaffolds; can frequently balance and occasionally stoop, kneel, crouch and crawl; can occasionally reach overhead bilaterally; can have frequent exposure to environmental irritants such as fumes, odors, dust, gases, and poorly ventilated areas; and must avoid exposure to unprotected heights. Tr. 80. The VE answered that such an individual could perform Merchant's past job of telemarketer. Tr. 81. The ALJ asked if the individual described could perform any other jobs and the VE stated that such an individual could perform the following jobs: order clerk (20,000 national jobs, 1,500 Ohio jobs); final assembler (25,000 national jobs, 1,000 Ohio jobs); and call center operator (400,000 national jobs, 1,000 Ohio jobs). Tr. 81.

The ALJ asked the VE if his answer would change if the hypothetical individual could never reach overhead bilaterally. Tr. 81-82. The VE stated that his answer would not change. Tr. 82. The ALJ asked the VE if his answer would change if the second hypothetical individual described would be further limited to frequent handling and fingering objects bilaterally and the VE answered no. Tr. 82. The ALJ asked the VE if his answer would change if the third hypothetical individual described would be further limited to lifting up to ten pounds

11

occasionally and the VE answered no.  Tr. 82.  Lastly, the ALJ asked the VE to what extent a worker could be off-task and still be able to perform any of the jobs previously discussed.  Tr. 82.  The VE replied that a worker could be off-task no more than ten percent of the time.  Tr. 83.

Merchant's attorney asked the VE whether his answer to the ALJ's first hypothetical would change if the individual had the following, additional limitation: she would need to get up and walk around as needed for comfort, i.e., leave the work station for at least ten minutes per hour.  Tr. 83-84.  The VE answered that he believed that this limitation would be too much.  Tr. 84.  Merchant's attorney asked the VE how many days of work an employee can miss before it is no longer tolerated.  Tr. 84.  The VE answered that no more than two absences a month would be tolerated.  Tr. 84.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id*.

### IV. The ALJ's Decision

In his November 20, 2014, decision, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2014.  Tr. 23.

2.  The claimant has not engaged in substantial gainful activity since February 1, 2012, the alleged onset date.  Tr. 23.

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

3. The claimant has the following severe impairments: osteoarthritis/degenerative joint disease of the bilateral knees; residual effects of remote left ankle injury; and obesity with a Body Mass Index (BMI) in excess of 40.  Tr. 23.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 24.

5. The claimant has the residual functional capacity to perform the following range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a): The claimant can lift and carry up to 10 pounds frequently and up to 20 pounds on occasion; she can sit for at least 6 hours, and she can stand/walk for about 2 hours, during the course of an ordinary 8-hour workday, with usual and customary breaks.  The claimant can never climb ladders, ropes, or scaffolds, and she must avoid unprotected heights, but she can occasionally climb ramps/stairs, stoop, kneel, crouch, crawl, and reach overhead bilaterally, and she can frequently balance.  The claimant can have frequent but not constant exposure to pulmonary irritants such as fumes, dusts, odors, gases, and poorly ventilated work areas.  Tr. 25.

6. The claimant is unable to perform any past relevant work.  Tr. 31.

7. The claimant was born on December 18, 1965 and was 46 years old, which is defined as a younger individual age 18-49 on the alleged disability onset date.  Tr. 31.

8. The claimant has a limited education and is able to communicate in English.  Tr. 31.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 32.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 32.

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2012, through the date of this decision.  Tr. 32.

## V. Parties' Arguments

Merchant objects to the ALJ's decision on two grounds.  She argues that the ALJ erred when he gave little weight to the portion of consultative examiner Dr. Massullo's opinion that Merchant should have a sit/stand option and failed to properly consider Merchant's complaints of pain.  Doc. 14, pp. 11-18.  In response, the Commissioner submits that the ALJ properly considered the opinion evidence and Merchant's complaints of pain.  Doc. 17, pp. 11-18.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err when he assessed Dr. Massullo's opinion

Merchant argues that the ALJ erred because he gave substantial weight to Dr. Massullo's opinion that Merchant can perform sedentary work but dismissed the portion of Dr. Massullo's opinion that imposed a sit/stand restriction.  Doc. 14, p. 12.

In deciding the weight to give a medical opinion, the ALJ considers factors such as the examining or treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. §

416.927(c).  The ALJ considered Dr. Massullo's opinion at length, and found, in pertinent part, the following:

> Dr. Massullo observed the claimant to appear "grossly obese, with fair mobility [and] good dexterity", although her "gait was abnormal with limp favoring the left lower extremity and it was slow and cautious"; the claimant's lungs "were clear to auscultation and percussion without rhonchi, rales or wheezing" and the claimant exhibited "no exertional shortness of breath" (Exhibit 1F).  Her "peripheral pulses were full" and the claimant "did not allege trouble maintaining balance", and she had "no apparent need for an ambulatory aid" (Exhibit 1F).
> \*       \*       \*
> Dr. Massullo advised that the claimant appeared "able to be in an upright position, on her feet for at least 2-3 hours out of an eight-hour workday, either standing or walking[.]" .... Dr. Massullo ... noted that the claimant's "motor system presented good tone, strength and coordination with apparent normal ability to rise from the seated position without using hands, ability to mount the examination table, ability to dismount the examination table, toe walking, [and] heel walking"...
> \*       \*       \*
> Dr. Massullo advised from her findings and the claimant's reported difficulties that "prolonged walking, standing, traveling using the bilateral lower extremities, bending, or lifting using the bilateral lower or upper extremities" were "compromised" by the claimant's bilateral knee, left ankle, and bilateral shoulder dysfunction, noting also the claimant's obesity and hypertension; she indicated, however, the claimant appeared able to work in "a seated position where she could get up and move about as needed"...
>
> Although Dr. Massullo's opinion lacks some specificity, her opinion appears consistent overall with the finding that the claimant retains the ability to perform the range of sedentary work set forth above, and in this regard, I have accorded her opinion weight herein.  I have, however, accorded little weight to what appears to be a recommended sit/stand option, as this limitation is not supported by the subsequent medical or opinion evidence of record.

Tr. 28-29.

As an initial matter, Merchant's apparent argument that the ALJ erred in failing to follow the treating physician rule and ignored Dr. Massullo's "longitudinal perspective for acceptance of most of h[er] opinions, and [that she] also had the same professional longitudinal perspective to accept the sit/stand option recommendation" fails.  Doc. 14, p. 13.  Dr. Massullo is not a treating physician; she is a one-time consultative examiner and, therefore, had no "longitudinal perspective" from which to draw.

16

Merchant's argument that the ALJ "cherry-picked" the record "to avoid analyzing all the relevant evidence" (Doc. 14, p. 13) also fails because the ALJ did not avoid analyzing relevant evidence. Instead, the ALJ considered Dr. Massullo's apparent sit/stand restriction head-on. Doc. 29. The ALJ observed, accurately, that Dr. Massullo's opinion lacked specificity, was, nevertheless, consistent overall with sedentary work, and that her opinion that "[a] seated position where [Merchant] could get up and move about as needed ... appears possible" was an apparent "sit/stand option," which he gave little weight. Tr. 29, 319. He discussed Dr. Massullo's findings cited by Merchant in her brief, including Dr. Massullo's objective examination findings (that Merchant was grossly obese, walked with a limp, had diminished ranges of motion and/or flexion in her shoulders, hips and left knee) and her consideration of Merchant's x-ray results. Tr. 28-29. He explained that he gave Dr. Massullo's apparent sit/stand option little weight because it was unsupported by other evidence in the record. Tr. 29. This was not error. *See* 20 C.F.R. § 416.927(c)(3) ("the more a medical source presents relevant evidence to support an opinion ... [and] [t]he better an explanation a source provides for an opinion, the more weight we will give that opinion."). Merchant's argument boils down to a disagreement with the ALJ's conclusion, which is not a basis for reversing the ALJ's decision.[5] *See Garner*, 745 F.2d at 387 (A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility.").

**B. The ALJ did not err when she considered Merchant's complaints of pain**

Merchant argues that the ALJ did not follow the proper procedure when he evaluated her complaints of pain. Doc. 14, p. 15. She asserts that the ALJ "should have proceeded in

---

[5] At the hearing, Merchant's attorney asked the VE whether a hypothetical individual could perform work if that individual had to get up and leave the work station for at least ten minutes every hour, to which the VE answered no. Tr. 83-84. Leaving the workstation for at least 10 minutes every hour is not the same as a sit/stand option. Dr. Massullo did not opine that Merchant would have to get up and leave the work station every hour for at least ten minutes.

17

accordance with the terms of Social Security Ruling SSR 88-13." Doc. 14, p. 15.  SSR 88-13, 1988 WL 236011, was superseded more than twenty years ago by SSR 95-5p, 1995 WL 670415, which in turn was superseded by SSR 96-7p, 1996 WL 374186, which was in effect at the time of the ALJ's decision.  SSR 96-7p provides that, when assessing the credibility of a claimant and her complaints of symptoms, an ALJ considers the claimant's daily activities; the location, duration, frequency and intensity of pain and other symptoms; aggravating factors; the type, dosage, effectiveness and side effects of medications; treatment received; and measures other than treatment used.  *See also* 20 C.F.R. § 416.929(c) (When evaluating the intensity and persistence of pain, the ALJ considers all available evidence, including objective medical evidence obtained from clinical and laboratory diagnostic techniques; the claimant's daily activities; the location, duration, frequency, and intensity of pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medications taken; treatment, other than medication, received; and any measures used to relieve pain).

     Merchant argues that the ALJ failed to adequately consider the objective test results and the "findings and opinion of [her] physician's [sic]." Doc. 14, p. 16.  The Court disagrees.  The ALJ detailed Merchants x-ray results (Tr. 27 (July 2012 x-rays); Tr. 29 (September 2012 x-rays); Tr. 30 (March 2013 x-rays)), testing performed by Dr. Massullo (as described above) and findings by Molly Howsare, D.O. (Tr. 30); and other objective findings by Merchant's physicians.  *See, e.g.*, Tr. 27 (objective findings of mild tenderness and crepitus in left knee and a limp); Tr. 28 (objective findings of mild edema and crepitus in left knee); Tr. 29 (edema in left knee and slight weakness upon dorsiflexion of left foot, diminished strength (4/5) at left hip and knee); Tr. 30 (swollen left knee with intact muscle strength, negative draw tests, and no focal or motor sensory deficits).  He considered her daily activities and her alleged limitations.  Tr. 27,

18

28. He also considered her treatment; indeed, he explained that she sought treatment on an infrequent basis (Tr. 28, 31), failed to follow up with recommended treatment (Tr. 30-31), and failed to purchase her prescribed medication, available for $4 for a month's supply, which was less than the cost of the cigarettes that she routinely smoked (Tr. 29).  The ALJ followed the proper procedure when he considered Merchant's allegations of pain and his decision is supported by substantial evidence.  It must, therefore, be affirmed.  *Wright*, 321 F.3d at 614 (A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record); *Garner*, 745 F.2d at 387.

## VII. Conclusion

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.


Dated: February 14, 2017

Kathleen B. Burke
United States Magistrate Judge